Esquivel, I'm not sure I'm going to pronounce this correctly, Carrizales, you scared me there for a minute. We just call him Mr. Esquivel. Okay. Mr. Martin. Hey police the court, Scott Martin for Mr. Esquivel. This appeal concerns the denial of Mr. Esquivel's motion to suppress the drugs and other evidence found by police in a 2018, in a Houston. In his motion, Mr. Esquivel argued that the investigation of the traffic violation was unreasonably prolonged under Rodriguez v. United States, but the district court pre-terminated consideration of that issue when it held that to the extent the stop could possibly be considered prolonged for the traffic violation, it was not prolonged because it was necessary to investigate the reasonable suspicion that Esquivel, the car's driver, had just engaged in a drug deal with a man named Santos in a shopping center parking lot. The district court was wrong and viewed the totality of the circumstances, including the collective knowledge of the agents and officers, the officers had no reasonable suspicion of a drug deal. Now, the circumstances related to Esquivel and Pena were that these two men, who agents knew nothing about, had just left a store in a shopping center carrying things that they had bought and put those things in the trunk of a Volkswagen in the shopping center parking lot. It was 10 p.m. at Christmas time and so the stores were still open and there were people and cars around. An agent saw Pena get something out of the back seat of Santos' Dodge pickup truck, which was parked nearby, and put it in the trunk of the Volkswagen, or to be precise, Agent Postone had told Agent Rogers, who testified at the suppression hearing, that he had seen Pena get something out of the back seat of the truck, but Agent Rogers was not sure if Agent Postone could see exactly what it was. The truck had a fake compartment that the law officers already knew was there, right? Had a hidden compartment? Yes, Your Honor. We knew that all that was known about Santos at the time was, one, that he had a hidden compartment installed, an external diesel tank, on his pickup truck, which a fact that has less relevance here because Pena retrieved the item from the back seat of the truck, not the hidden compartment. The other things they knew about Santos was that he associated with drug traffickers in Brownsville and he was headed north that day towards Houston. There was no tip that he was transporting drugs that day, that Santos was. Agent Oliphant, who was the agent in Brownsville, did not recall whether the cooperating defendant in Brownsville had said that Santos would be making a drug delivery that day. Brownsville agents told Houston agents that they had a vehicle coming north from Brownsville that was possibly loaded with narcotics and Brownsville agents didn't know Santos was actually transporting drugs and they were just passing along what they called a good lead. That's at row 574. Santos' travel between Brownsville and Houston, though it's relevant because the agent testified that Brownsville and Houston is a drug corridor, provides little support for reasonable suspicion because law-abiding citizens travel between those two cities every day. It's like in United States versus Reyes, which is a case cited in the government's brief. This court noted that the fact that the defendant there had come from Dallas-Fort Worth area, a known source for drugs, provided quote little support for reasonable suspicion. The fact that Santos met with these two men, Esquivel and Pena, in a shopping center parking lot at 10 p.m. also provides little support for reasonable suspicion because, again, it was Christmastime and as the district court recognized, Santos could have been bringing a non-drug related Christmas gift from Brownsville to friends. In fact, on this record, Santos could also have been bringing a gift purchased at a store in Houston because Agent Rogers agreed it's possible that Santos' pickup truck made stops at other locations within Houston prior to going to the Westheimer stop. On this record, that seems pretty speculative about the Christmas shopping. I mean, here, they're not operating on a hunch, so... Well, Your Honor, I disagree that it's support of a reasonable suspicion here given the circumstances and also considering the possibility that this car had gone to other locations before arriving at this stop and the little that we know about Santos, the fact that there was no tip that he was delivering drugs that day. Other factors that weren't present in this case, Your Honor, was that there was no controlled drug buy, unlike in Garza, which is a case cited in the governance brief. In that case, the detectives had set up a controlled drug buy using a cooperating source and observed the vehicle arriving and leaving the location and one of the detectives had received confirmation that the source had purchased heroin from Garza. We don't have that here. There also was no apparent exchange of money, unlike in the United States, which is Martin, which I've cited in my case. It's an 11th Circuit case where that was the one where the officer had observed a defendant shake something out of a black container before replacing in the wheel well of a vehicle and then engage in conduct, which would appear to be a trade of the substance for money with an unidentified individual. We don't have anything like that here. Also, there was no, unlike in Ibarra-Sanchez, which is a case the government relies on in its brief, there's no quote cornucopia of factors suggesting that drug-related activities were routinely occurring or occurring at all. Beyond the facts that, you know, clearly you're disputing reasonable suspicion, but help us out. This was a stipulated bench trial, so we've got a number of cases where that's the case, so clarify for us the extent to which the issue is preserved. You know, what did he agree to, not agree to? How is it preserved? How does it fit within the various kind of stipulated bench trial cases we have? Yes, Your Honor. This was a, as the government also agrees, this was a unique procedure that was agreed to by all the parties and the court for the purpose of resolving this case when a juror got COVID. It was basically a bench trial by the court, as you have shown. Mr. Esquivel was clearly trying to preserve something here. There was no intentional relinquishment of a known right, which is what's required for waiver under Andino-Ortega, which we've cited in our brief. Well, let me, I was going to ask. He was going to have a jury trial, right? Yes, Your Honor. But there was no reservation of the... Yes, Your Honor. We sought a jury trial, not a guilty plea, and when a juror became infected with COVID and the court declared a mistrial, he elected to go forward with what the court called a stipulated bench trial. I mean, the fact that he was about to go to a jury trial suit makes it sound as if he did not plead guilty conditionally, or did he? He did not plead guilty at all, Your Honor. It was... How is this preserved? We did not agree with the facts. We did not contest, but we did not agree with the facts. Garcia-Ruiz agreed to the facts, the stipulated facts, and nothing said by the district court at the bench trial indicated that it would have convicted Esquivel absent the government's proffered facts about the drugs found in the car. Did he not contest facts which, irrespective of the motion suppressed, would still leave him culpable? Your Honor, we contested all of the facts in the proffered facts by the government, all of the facts, including the statements about the drugs. So we did not agree to those facts. We did not contest them. We did not agree to them. What does it mean in real time to not contest facts in a stipulated bench trial, but yet carve out a reservation of what facts are still alive in the motion to suppress? You follow what I'm saying? How here? Some of our cases have required an express waiver. In these stipulated bench trials, there's an express waiver, so it makes it clear what's being held back. Here, there's no express reservation here. In the absence of that, between the stipulation of the trial, but I don't contest, where does this fit? The government doesn't argue that. In other words, is it preserved, and if so, is it harmless because of the facts that the government needed to prove the elements? That's kind of what I'm asking. How do we get . . . Your Honor, for one, the element, it was with possession where they tend to distribute the drugs. That was one of the counts, and we did not agree to any of the facts related to the drugs that are the drugs that we were trying to suppress in our motion to suppress. We did not agree to the government's proffered facts, unlike the defendant in Garcia-Ruiz. This is sort of like the Shavira case I've cited in my brief, where that was a false statements case where the defendant had proceeded to a stipulated bench trial, a more traditional stipulated bench trial, but the court on appeal vacated the conviction and wrote that the trial court erred by denying Shavira's motion to suppress her statements elicited by the Customs and Border Patrol secondary process in violation of Miranda. So there was a Miranda violation, and it went on. The court went on and said, of course the trial court's error is subject to the harmless error doctrine. We recognize that the stipulation, wholly apart from anything contained in its paragraph eight and without consideration of anything that Shavira at the secondary inspection . . . stated by Shavira at the secondary inspection, might be sufficient to sustain her conviction. However, and this is the part that is most relevant, the problem is that the district court, as the trier of fact, expressly relied on the entire stipulation, including the statements recited in paragraph eight, which we hold inadmissible under Miranda. Nothing said by the trial court indicates it likely would have convicted absent the facts stated in paragraph eight of the stipulation. We are therefore constrained to hold that the error was prejudicial. Your Honor, our position in this case is very similar. We have a proffered set of facts. The court, the district court found Esquivel guilty, quote, on the stipulated facts that the government presented, end quote. That's row 851. It did not say that it was relying on only part of the government's statement of facts. It relied on the entire statement. Therefore, our position is that it was prejudicial and it was preserved in the sense that our refusal to agree to the facts was a signal of our intent to preserve everything, including the suppression issue. Of course, the government clearly needed the drugs that Esquivel claimed should have been suppressed, at least for count two, which was possession with intent to distribute. What is your best case for the statement that we do not contest but do not agree being sufficient to preserve? I don't have a case directly on point, Your Honor, because, again, this was an unusual procedure that was agreed to by everyone. Again, I think that as for waiver, I would just go with the general cases, Andino, Ortega, and others that say that waiver is the intentional relinquishment of a known right. Here, we were obviously trying to preserve something. Defendant's counsel purposefully avoided the word agree, which distinguishes this case from cases like Garcia Ruiz, where the defendant and the government agreed to stipulated facts that established all the elements of the offense. It's also unlike Ramos Flores, which is cited in Garcia Ruiz, where the defendant stipulated facts but did not reserve or otherwise signal his intent to appeal the denial of the suppression motion. Your Honor, our position is that by not agreeing to the stipulated facts, that we were clearly trying to preserve something here. What does stipulated mean? I don't understand the distinction between stipulated and agreed. Stipulated, Your Honor, would be that we agree that those facts are true. And in this case, we did not agree to anything. We wanted a trial. We did not contest, but we wanted a trial. And when the juror got COVID, this was the procedure that . . . The case is different in that it didn't go to jury trial because of COVID. But once you back that out, it's not different than some other case where just the parties decide to have a stipulated . . . So I don't see how the COVID makes it different. That's just the reason it didn't go full force to jury. But once you take that out of the picture, it doesn't add a dimension to the calculus of deciding the stipulation preservation piece. That's where the rub is, at least. Your Honor, I disagree slightly with that. I think it does add to the . . . A waiver has to be intentional. I think it gives context to why this was not an intentional waiver of the issue. So you have the two issues. You have waiver, which is what is the intent of Mr. Esquivel. And our position is that by not agreeing to these facts, that we were intentionally trying to preserve everything here as if we had gone to a complete jury trial, instead going to this bench trial we did. And then there's the issue of harmlessness. And I've given you the Shavira case. And the fact that the court relied on the entire set of proffered facts so that the district court . . . this court should find that it's constrained to hold the errors prejudicial just as it did in Shavira. Well, assuming . . . I know you're running out of time, but assuming we aren't convinced about that he could have been getting Christmas presents, that there was reasonable suspicion, even if it is preserved, if we say there's reasonable suspicion, you still can't prevail on the motion to suppress, huh? I agree. I mean, we've argued there was no reasonable suspicion, but I do agree that if you find that there was a reasonable suspicion that a drug deal occurred in that parking lot at the Galleria, Houston Galleria, that the motion to suppress would fail. But we've contested that, and of course the district court as well did not consider the Rodriguez issue. We're asking you to remand for conclusions of law and findings on that issue. Thank you. May it please the court, Eileen Wilson, on behalf of the government. This court should reject Esquivel's repeated attempts to isolate and segregate singular facts rather than view them in the totality of the circumstances.  ignores the Supreme Court's recommendation to the Supreme Court and the Supreme Court's warning not to treat each factor in isolation. Here, the district court described the evidence in detail and correctly applied the law using the totality of the circumstances. The aggregation of the facts combined with the collective knowledge and experience of a law enforcement officer supports the district court's decision here. The foundation for the reasonable suspicion occurred in Brownsville. Santos, who's not a defendant here in this proceeding, was a target of an ongoing drug trafficking investigation. HSI Brownsville had enough evidence to obtain a tracker warrant to attach to Santos' truck. For about 10 days, they monitored his movements. They knew he met with known drug traffickers as well as people who smuggled cash bulk or bulk cash smugglers. They also knew that Santos had retained a confidential informant to build a hidden compartment for his truck. Experienced law enforcement testified that it's very common to use secret compartments to transport drugs or cash. Yet the compartment wasn't checked in this instance? I'm sorry, I can't hear you. Yet the compartment was not checked during this stop, is that correct? During the stop? The compartment, once they were in the Houston Galleria's parking lot, was the hidden compartment ever checked? That's correct, except it came out of the back seat, except we know at a minimum that on his way up to Houston Santos stopped at a gas station and that's on page 595 through 96. So the drugs could easily have been extracted from there. But we also know that Brownsville to Houston is a well-known drug corridor. Again, while standing alone, that may be innocent because you, I, other people in this courtroom may go back and forth to Brownsville occasionally or up from Brownsville. It's the collective knowledge, it's the totality of the circumstances is what's important here. And the totality of the circumstances in a Fourth Amendment case includes both the collective knowledge and the experience of officers. And here, Brownsville, HSI Brownsville communicated their information and suspicions to HSI Houston. Houston rolled out, as they said, and watched Esquivel, Pena, and Santos in the parking lot across from the Galleria around 10 o'clock, five days before Christmas. Santos was backed into his parking space which suggests possibly that if he needed to leave quickly, he could have done so. The VW was parked one to two spaces away. Law enforcement watched as they went back and forth. Esquivel, the defendant here, spent fifteen minutes in Santos' truck. Do we know what happened there? No, of course not, but it's very possible the money could have exchanged hands there. Most people in the city are not going to be flashing cash in a parking lot these days, especially when you're talking about significant amounts of cash. In any event, Pena took a box or something else out of the back passenger seat and put it in the VW. Esquivel's brief a few times questions whether it was a box, so for the court's consideration, I don't think it really matters. We know something was transported, but for the court's consideration, that's on pages 583 through 84, 599 and 603. Also, while Esquivel was sitting in Santos' truck for the ten or fifteen minutes, Pena's walking around and talking on the phone, so it seemed like it was a very charged situation that was going on, and after they left the Galleria area, they were surveilled by various officers. The collateral agent, or the agent in charge, whom Brownsville had contacted, the Houston agent, Agent Rogers, then turned around and communicated the information to Deputy Sweeney, who was the one who ultimately pulled Pena and Esquivel over for a traffic violation, but at that time, he already had the reasonable suspicion of the drug trafficking based on the collective knowledge that had been imputed to him. The testimony is a little bit unclear, admittedly, about Deputy Sweeney, but what we do know is that Pena was very, very nervous, and certainly, a lot of people are nervous when they're pulled over by law enforcement, but Deputy Sweeney, who had twenty-two years of experience, said it was very, very difficult for him to make eye contact. He was also refusing to make eye contact, rather, fumbling with his wallet, so Deputy Sweeney asked him to go behind the sedan to talk about what was going on, and they did that. In the meantime, Pena still acted very nervous, was still fumbling around. He puts him in the unit, uncuffed. Deputy Sweeney then goes to approach Esquivel, the defendant here, and get his information, and Esquivel starts getting out of the car, which makes Deputy Sweeney very nervous. He tells him to get back in the car, to sit down or whatever, and gets his information, takes it back to the car, to the unit rather, and starts running this, or as he's about to start running this information, Esquivel gets out again. Because of Pena's nervousness and his behavior, coupled with Esquivel's getting in and out of the car trying to get out, Deputy Sweeney is very nervous, which of course this court has recognized traffic stops or whatever, stops are very dangerous, particularly if you think there's drug trafficking involved. And so he calls for backup. And when the backup comes, he asks them to put Esquivel in a separate unit, which they do. But what Deputy Sweeney believed that he had finished Pena's running his information, but was unsure if he finished Esquivel's or whether he even had the opportunity to run it. So it was a very difficult time. And Judge Miller had gone through those details in his order before he ultimately reaches his conclusion. And this court knows in the 48-page order he has to also discuss the Mississippi stop, which he finds was not valid, and reverses on that basis. And I think what happened was he parsed out the law and he discussed the law in the Mississippi situation and that more or less transferred over, the analysis transferred over to the Houston stop and then he was able to reach his conclusion. So there's no evidence in the record that Deputy Sweeney either had finished the traffic stop or had prolonged the detention. But as Judge Miller found, even if it was prolonged he had a basis to do that based on the drug trafficking and the collective knowledge. And while I realize Rodriguez says that a certain amount of time doesn't make something constitutional, just for this court's knowledge, the total time between this was eight minutes, which I think factors into whether or not you can determine whether Deputy Sweeney was diligent in this process. I don't know if the court is interested in the government's position on or the position it took in relation to the preservation but Judge Stewart, just for clarity, we thought that based on the fact that this was early in the pandemic, Judge Miller had called the case COVID cursed. They were getting ready to go to trial, now a juror was sick and we just thought that the correct or the fair position in this situation would be to say or to agree that any waiver was not intentional or knowing. But having done that we also recognize that we don't make that decision the court makes that decision and that's discussed in the last couple pages of the brief. So in any event, viewing the evidence in the government's favor, the totality of the circumstances and law enforcement's collective knowledge proved no error occurred. And unless the court has any questions, the government requests that you affirm. Well, what's your view on the questions we've asked about this stipulated . . . I stipulate but I don't agree. So I know you're not arguing, not you personally, the government's not already said. So in this stipulated bench trial scenario what's enough to preserve the issue? For them? For Mr. Esquivel? Not arguing waiver. So what is it harm . . . if it wasn't here, it's harmless because of the overall circumstance. I mean, I get what you're saying. Right. Express waiver because of the COVID situation. Right. Well, I think again, I think what happened was there was a lot going on at the time. And the cases that I've seen during my years with the government, typically a defendant will expressly waive something. Whether it's in a plea agreement or otherwise they'll say we're preserving our right to challenge the motion to suppress, which is very, very common. In this case, again, I get the COVID driver of it. But when you toss that out, you're still left with a, quote, stipulated bench trial with words that, you know, appear in other cases. I don't agree but you're not arguing waiver. So what's the . . . from this case, what is it? But the issue was preserved? Well, ordinarily, we would have argued that it was not preserved. And I realize you're not, and I respect this, not giving a lot of weight to the COVID environment. But that is the reason we agreed to this. But for COVID, we wouldn't have taken this position. But it was . . . It's kind of a tweener. I mean, take the view, there's no express waiver. Got it. On the other hand, no intentional . . . I mean, no express reservation of the preservation of the issue. On the other hand, no intentional waiver. So it's kind of that between category. We're just trying to reconcile the language necessary because surely we won't write the case well because this is a COVID-driven case. Here's some exception. Do you follow? Yes, I do. I know that the government says it doesn't matter because there was reasonable suspicion. So even if it's preserved, he loses. But we're just . . . Right. Well, it's very confusing because you normally, a defendant either disagrees with something or agrees to it. And I assume the words were chosen carefully with all due respect to and maybe everybody there sort of pushed a little harder on it. But to the extent that the court is going to find that a waiver wasn't intentional, then typically, yes, you would go down your usual standards of review. I mean, I would have to agree with that, yes. Thank you. Thank you. Your Honors, I'd first like to address my friend for the government here said with reasonable suspicion that the drugs could easily have been extracted from Santos' pickup truck at the gas station before it stopped at the Westheimer location. That's consistent with the point I was making that Agent Rogers did not know when the Volkswagen arrived at the shopping center parking lot and he agreed it was possible the car was making stops at other locations within the Houston area going to the Westheimer stop. So we have the government saying it's possible that if Santos was carrying drugs, he unloaded it before he even got there. And again, it's also that we have the court that found that Santos could have been bringing a non-drug related Christmas gift from Brownsville to Friends. That's the district court recognizing that. And another point we've made is that Santos could also have been bringing a gift purchased at a store in Houston, potentially, if Agent Rogers didn't know where the car was before it got to the shopping center. The second point I'd like to make is my friend from the government said that it was a box. Again, Agent Pistone, who did not testify at the suppression hearing, is the one who told Agent Rogers, who did testify, that he had seen Pena get, quote, something out of the back seat of the truck. But Agent Rogers at the suppression hearing testified that he was not sure if Agent Pistone could see exactly what it was. So we don't know that the collective knowledge that the agents had at the time of the stop, they did not know what it was. They did not know it was a box. They have no idea. The next thing I'd like to point out about the two men's behavior, Esquivel and Pena's behavior during the traffic stop, although Pena was certainly nervous during the stop, there is no evidence or testimony that he acted evasively. This court in U.S. v. Monsivais 2017 published case said that nervousness carries with it no readily discernible connection to criminal activity. This case is not like the United States v. Berry, which is cited in the government's case in which this court held a state trooper had reasonable suspicion to extend a traffic stop where, among other things, the defendant appeared nervous and gave inconsistent and untruthful statements about the purpose of his travel during the stop. That was the evasiveness in Berry. We don't have anything like that here. What about Esquivel's getting out of the car? The deputy testified that Esquivel kept getting out on me, but it was unclear how many times that was. The deputy did testify that he didn't want to be in the car, but did not describe this as an attempt to distance himself from the car, and the district court did not find that. We know from prior cases in this court that just getting out of a car does not create an inference that the car contains contraband or weapons. That case is called United States v. Hunt, a 2001 case, 253 F. 3rd 227. In that case, the court said, the government has presented no empirical data, nor has our independent research discovered anything suggesting that the act of a driver, in that case it was a driver, who has been stopped for a traffic violation leaving his car to greet the officer creates either a permissible or compellable inference that the automobile contains contraband or weapons. In addition to that, Your Honor, none of the other usual sorts of facts supporting suspicion were present during the stop. Again, there were no inconsistent or implausible stories about travel itinerary or the purpose of travel, so it's unlike Reyes cited in the government's brief, or Gomez cited in the government's brief, or Smith, or Berry. These are the cases the government relies on. They all have inconsistent or implausible stories about travel. There was no evidence that a driver had a prior drug conviction, unlike Reyes and Gomez, or that one of the car's occupants had an arrest warrant for a parole violation, like Smith, or that the vehicle was registered as someone else, like Reyes. Finally, on the Rodriguez prolongation issue, Your Honors, we're asking for a remand for additional findings and conclusions. The District Court made no findings on the question whether Deputy Sweeney's investigation of the traffic violation was appropriately limited to the time needed to handle it. That's a factual question that the District Court needs to decide in the first instance. Most importantly, it made no findings regarding when, if ever, the Deputy's computer record checks were completed, which matters greatly because this Court says an investigation into the initial cause of a traffic stop finishes ordinarily when the computer checks come back clean. We know that from Madrigal, which we've cited, going back to Brigham, and Lopez Moreno. These are all cases cited in the briefs. For example, these are the questions that are left unanswered. Were the record checks completed by Deputy Sweeney before Pena was asked for and gave consent? If so, how long before? Did Sweeney even do a records check? These are things we don't know. Your Honors, the ambiguity is the government's fault. As the government acknowledges in its brief, Deputy Sweeney did not know or log what time he ran Pena and Estabelle's information or when any records checks came back, and did not have a copy of the computer printout of the call log, but thought he could get one. Well, we never got the call log from the Deputy. The only thing we do know is that Deputy Sweeney made no attempt to write a ticket. That's at row 683-84. Your Honors, unless there are any further questions, I see my time is up. I'll rest on my briefs. Thank you. Thank you, Counselor.